T.C. Memo. 2008-219

UNITED STATES TAX COURT

LINMAR PROPERTY MANAGEMENT TRUST, NORMAN PARSONS, TRUSTEE,
Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

RAYMOND M. MARLIN, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 18743-06, 19283-06.  Filed September 25, 2008.

Norman Parsons, pro se.

Raymond M. Marlin, pro se.

Chong S. Hong, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HAINES, Judge:  In these consolidated cases, respondent determined deficiencies in Federal income taxes and additions to tax with respect to Raymond M. Marlin as follows:[1]

|      |            | Additions to Tax | | |
|------|------------|------------------|-----------------|------------|
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6651(a)(2) | Sec. 6654 |
| 1999 | $186,645 | $41,995 | $46,661 | $9,033 |
| 2001 | 39,282 | 8,838 | [1] | 1,570 |
| 2002 | 75,021 | 16,880 | [1] | 2,507 |
| 2003 | 140,128 | 31,529 | [1] | 3,667 |

[1]Respondent determined that Mr. Marlin is liable for sec. 6651(a)(2) additions to tax for 2001 through 2003 in an amount to be determined.

Respondent determined deficiencies in Federal income taxes and additions to tax with respect to Linmar Property Management Trust (Linmar or Linmar Trust)[2] as follows:

|      |            | Additions to Tax | | |
|------|------------|------------------|-----------------|------------|
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6651(a)(2) | Sec. 6654 |
| 2001 | $41,305 | $9,294 | $10,326 | $8,261 |
| 2002 | 71,774 | 16,149 | 13,637 | 14,355 |
| 2003 | 132,735 | 29,865 | 17,256 | 26,547 |

The primary issue in these cases is whether certain income is attributable to Linmar Trust or Mr. Marlin. As explained more fully below, the Court holds that Linmar Trust must be disregarded for Federal income tax purposes and the income at issue is properly attributable to Mr. Marlin.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended. Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. Amounts are rounded to the nearest dollar.

[2]The use of the term "trust" and of related terms such as "trustee" and "beneficiary" is for convenience only and is not intended to be conclusive as the characterization of Linmar Trust for Federal tax purposes.

The other issues for decision are: (1) Whether and in what amounts Mr. Marlin received unreported income; (2) whether Mr. Marlin is entitled to claimed deductions; (3) whether Mr. Marlin is liable for self-employment taxes; and (4) whether Mr. Marlin is liable for additions to tax under sections 6651(a)(1) and (2) and 6654.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. When the Court filed their petitions, Linmar Trust had a mailing address in California, and Mr. Marlin resided at the same California address.

Mr. Marlin's Businesses

During the years at issue Mr. Marlin owned and worked for Marlin Mechanical, Inc. (Marlin Mechanical), and Marlin Mechanical Contractors (Marlin Contractors), a sole proprietorship. These businesses provided mechanical construction services on commercial and industrial projects, specifically services related to fire sprinklers, plumbing, refrigeration, heating, ventilation, and air conditioning systems.

Linmar Trust Formation

On August 31, 1991, Beverly Cahill and Eules Grisby signed the Linmar Trust Declaration of Contract and Indenture of Trust (Linmar Trust contract) as creator and exchanger respectively. According to trust documents, Linmar's capital units, i.e., its certificates of beneficial interest, were originally issued to Redondo Enterprises. On January 1, 1994, the capital units were purportedly transferred to Nevet's Investments. However, on its 1999 Federal income tax return, Linmar's beneficiary was listed as Redondo Enterprises.

Linmar Trust Real Estate

On January 10, 1992, Mr. Marlin transferred four parcels of real estate to Linmar Trust: 535 North Church Street, Visalia California; 15675 and 15676 Avenue 296, Visalia, California; and 231 Olive Street, San Francisco, California. Before its transfer to Linmar Trust, the North Church Street address was Mr. Marlin's residence. When he filed his petition, Mr. Marlin still resided at the North Church Street address. Marlin Mechanical and Marlin Contractors used the Avenue 296 addresses before and after the transfer of the real estate to Linmar Trust. As part of the transfer of real estate, Linmar Trust purportedly gave Mr. Marlin a promissory note in the amount of $242,338, requiring Linmar to make monthly payments of $2,165.

Linmar Trust's Trustees and Representatives

Linmar Trust's initial trustee was Winnie McGuire, Mr. Marlin's wife. Winnie McGuire died on April 7, 2000, while she and Mr. Marlin were traveling in Hawaii.

On September 3, 1991, Winnie McGuire appointed Kathleen Botta, formerly known as Kathleen Marlin, and now known as Kathleen Remillard, as Linmar Trust's financial agent. Ms. Remillard is Mr. Marlin's daughter. On September 7, 1991, Winnie McGuire appointed Ms. Remillard as Linmar Trust's secretary. Ms. Remillard understood that Mr. Marlin and Winnie Mcguire made final decisions with respect to Linmar Trust

On September 7, 1991, Winnie McGuire appointed Eileen Pyzer, now known as Eileen McGuire, as contingent trustee of Linmar Trust. Eileen McGuire is Winnie McGuire's daughter. On June 8, 1992, Winnie McGuire appointed Eileen McGuire as cotrustee.[3] On April 14, 2004, Eileen McGuire resigned as trustee. While serving as trustee, Eileen McGuire did not know Linmar Trust's purpose, she did not participate in decisions with respect to Linmar Trust, and she had no involvement with Linmar's real estate or business operations. Eileen McGuire understood that

_____

[3]Mr. Marlin argues that Eileen McGuire was a contingent trustee at all times. However, Linmar Trust's minutes show that Eileen McGuire became a cotrustee. There is no mention of her status as a contingent trustee. Furthermore, in order to complete a property sale, Mr. Marlin represented that Eileen McGuire had power to represent Linmar Trust as a trustee.

Mr. Marlin made final decisions with respect to Linmar Trust. She believed Mr. Marlin was the beneficiary of Linmar Trust.

On September 15, 2001, Eileen McGuire appointed Judy Costa as a trustee. Ms. Costa was either married to Mr. Marlin or had a relationship familiar enough with him that they referred to each other as husband and wife.[4] Ms. Costa resides at the same North Church Street address as Mr. Marlin. On July 7, 2004, Ms. Costa resigned as trustee.

On February 5, 1995, Mr. Marlin was appointed manager of Linmar Trust and given authority over the day-to-day operations. On January 15, 2002, Linmar Trust and Mr. Marlin entered into a contract, providing among other things that in exchange for his trust management services and for occupying the North Church Street address (where he had been living for several years), Linmar Trust would pay Mr. Marlin an occupancy fee and all utilities. The contract also provided that Linmar Trust would lend Mr. Marlin funds for personal expenses. The contract was signed by Ms. Costa on behalf of Linmar Trust and by Mr. Marlin.

Linmar Trust Transactions and Minute Book

Linmar's minutes resolve that the day-to-day affairs of the trust were delegated to an officer of the trust. However, the minutes also state that all real estate matters were to be

---

[4]Marlin Mechanical's credit card statements show that on more than one occasion airline tickets were purchased for "Judy Marlin", including a trip that she and Mr. Marlin took to Hawaii in 2003.

referred to the trustees and that contract negotiations were subject to trustee approval. On October 22, 1999, Linmar Trust sold the Olive Street property. The minutes do not show trustee approval of the sale. On September 29, 2000, Linmar Trust sold the Avenue 296 properties. The minutes do not show trustee approval of the sale. From July 27, 2001, through April 14, 2004, Linmar Trust entered into and modified contracts with University Marelich Mechanical, Lloyd Allen Pump Service, and Jason Correia. The minutes do not show approval of any of these contracts.

Linmar Trust Distributions

On November 16, 1999, Linmar Trust wrote a check payable to Anglo Irish Bank, with Nevet's Investments written on the memo line. Linmar Trust's 1999 income distribution deduction was $424,179. Linmar Trust reported distributable net income for 2001, 2002, and 2003. However, Linmar's bank records do not show income distributions to Nevet's Investments or Redondo Enterprises. The Linmar Trust contract states: "Any capital unit holder may waive the right to receive any particular distribution or distributions, by delivering to the Trustees a written waiver prior to the date of the distribution, which waiver shall be entered in the Minutes." There are no such waivers entered in the minutes.

Mr. Marlin's Acts on Behalf of Linmar Trust

Mr. Marlin signed Linmar's tax returns and contracts. On February 11, 2004, Mr. Marlin completed a Form 8821, Tax Information Authorization, and a Form 2848, Power of Attorney and Declaration of Representative, on behalf of Linmar Trust. The signature line on Form 8821 states: "If signed by a corporate officer, partner, guardian, executor, receiver, administrator, trustee, or party other than taxpayer, I certify that I have the authority to execute this form with respect to the tax matters/periods covered." The signature line on Form 2848 states: "If signed by a corporate officer, partner, executor, receiver, administrator, trustee, on behalf of the taxpayer, I certify that I have the authority to execute this form on behalf of the taxpayer." Mr. Marlin then signed his name and as his title wrote "trustee" on each of the forms.

Account Commingling

During the years at issue Mr. Marlin did not have a bank account. Mr. Marlin did, however, have a credit card in his name through Citibank (Citibank card No. 3354). Mr. Marlin made payments on the card by endorsing and delivering to Citibank checks payable to him and Marlin Mechanical. Through its bank accounts, Linmar Trust also made payments on Citibank card No. 3354.

Marlin Mechanical also held a credit card with Citibank (Citibank card No. 4321). In addition to business-related purchases for Marlin Mechanical, Citibank card No. 4321 was used to purchase vacations and antiques. Linmar Trust made regular payments on Citibank card No. 4321.

Mr. Marlin claims the payments Linmar made on the two credit cards are reimbursements for Linmar's expenses. However, he has not shown, nor can the Court decipher, which expenses are attributable to Linmar and whether the amounts paid equal the expenses charged. Petitioners claim they have records detailing the expenses Mr. Marlin submitted to Linmar for reimbursement. Despite being given the opportunity to present the records, petitioners did not present them.

Checks payable to Mr. Marlin and his businesses were deposited into Linmar Trust's bank accounts. Linmar Trust's bank accounts were used to pay for Mr. Marlin's life insurance,[5] vacation timeshare, family members' educations, antiques, piano, and homeowner's insurance. Petitioners claim these amounts were offset by the value of checks deposited into Linmar Trust bank accounts by Mr. Marlin and his businesses. Neither petitioner has shown, nor can the Court decipher, how the payments and deposits are connected.

---

[5]Mr. Marlin claims the payments were made as a repayment of a loan Mr. Marlin provided Linmar. There is no evidence that Mr. Marlin made a loan to Linmar.

Petitioners' Returns and Notices of Deficiency

Mr. Marlin did not file Federal income tax returns for 1998, 1999, 2001, 2002, or 2003.[6] On April 25, 2006, respondent prepared substitute returns for Mr. Marlin for 1999, 2001, 2002, and 2003. On June 22, 2006, respondent issued Mr. Marlin a notice of deficiency for 1999, 2001, 2002, and 2003. Mr. Marlin timely petitioned this Court for redetermination of the deficiency.

Linmar Trust untimely filed its 1999, 2001, 2002, and 2003 returns on February 25, 2001, July 1 and December 19, 2003, and October 19, 2004, respectively. The 1999 return reported $424,179 of income and a $424,179 distribution deduction. The 2001 return reported $80,491 of income and a $80,491 distribution deduction. The 2002 return reported $70,371 of income and a $70,371 distribution deduction. The 2003 return reported $166,659 of income and a $166,659 distribution deduction. On June 26, 2006, respondent issued Linmar Trust a notice of deficiency for 2001, 2002, and 2003. Linmar Trust timely petitioned this Court for redetermination of the deficiency.

---

[6]Mr. Marlin did file a 2000 return, reporting zero tax due. However, on Mar. 7, 2005, respondent assessed a deficiency of $90,671 and a penalty under sec. 6662(a) of $18,137 with respect to Mr. Marlin's 2000 tax year.

OPINION

I. Burden of Proof

In cases of unreported income, the Court of Appeals for the Ninth Circuit, to which an appeal in this case would ordinarily lie, requires that the Commissioner provide a minimal evidentiary foundation connecting the taxpayer with the unreported income before the presumption of correctness attaches to the Commissioner's determination. See Hardy v. Commissioner, 181 F.3d 1002, 1004 (9th Cir. 1999), affg. T.C. Memo. 1997-97; Weimerskirch v. Commissioner, 596 F.2d 358, 360-361 (9th Cir. 1979), revg. 67 T.C. 672 (1977); Petzoldt v. Commissioner, 92 T.C. 661, 687-691 (1989). Once the Commissioner has met this initial burden, the taxpayer must establish by a preponderance of the evidence that the Commissioner's determination is arbitrary or erroneous. See Hardy v. Commissioner, supra at 1004.

As explained more fully below, the Court finds that respondent has introduced ample evidence connecting Mr. Marlin with the income-producing activities of Linmar Trust and with the various items of income not reported by either Mr. Marlin or Linmar. The record shows that Mr. Marlin had unfettered access to Linmar's financial accounts and property, and that he made all decisions with respect to Linmar. Mr. Marlin managed and resided in rental real estate properties owned by Linmar Trust. Amounts owed to Mr. Marlin and Mr. Marlin's businesses were deposited in Linmar's accounts, and Linmar paid their expenses. Furthermore,

respondent has presented sufficient evidence linking Mr. Marlin with the various items of unreported income through the bank deposits and specific items methods. Accordingly, the Court holds that respondent's determination is entitled to the presumption of correctness.

Petitioners have not claimed or established that section 7491(a) shifts the burden of proof to respondent with respect to any factual issue. Accordingly, petitioners bear the burden of proof and production for all issues, except as provided by section 7491(c). See Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933).

## II. Disregard of Linmar Trust as a Separate Entity

Respondent argues that Linmar Trust should be disregarded as a separate entity for Federal tax purposes because it lacks economic substance and is a sham. The Court agrees.

Taxpayers have the right to conduct their transactions in such a manner and form as to minimize or altogether avoid the incidence of taxation by whatever means the law permits. Gregory v. Helvering, 293 U.S. 465, 469 (1935). This right, however, does not bestow upon taxpayers a right to structure a paper entity to avoid taxation when that entity is without economic substance. Zmuda v. Commissioner, 79 T.C. 714, 719 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). The Commissioner is not required to apply the tax laws in accordance with the form a taxpayer employs where that form is a sham or inconsistent with economic

reality. Higgins v. Smith, 308 U.S. 473, 477 (1940). Application of these principles requires the Court to look beneath the surface of the entity and transactions at issue to examine their reality. Profl. Servs. v. Commissioner, 79 T.C. 888, 924 (1982).

If the creation of a trust lacks economic effect and alters no cognizable economic relationship, the Court may ignore the trust as a sham. See, e.g., Zmuda v. Commissioner, supra at 720; Markosian v. Commissioner, 73 T.C. 1235, 1241 (1980). This rule applies regardless of whether the entity has a separate existence recognized under State law and whether, in form, it is a trust, a common law business trust, or some other form of jural entity. Zmuda v. Commissioner, supra at 720. Whether a trust lacks economic substance for tax purposes is a factual question to be decided on the basis of the facts before the Court. Paulson v. Commissioner, T.C. Memo. 1991-508 (citing United States v. Cumberland Pub. Serv. Co., 338 U.S. 451 (1950)), affd. per curiam 992 F.2d 789 (8th Cir. 1993).

To determine whether a trust lacks economic substance for tax purposes the Court considers these factors: (1) Whether the taxpayer's relationship to the transferred property differed materially before and after the trust's creation; (2) whether the trust had an independent trustee; (3) whether an economic interest passed to other trust beneficiaries; and (4) whether the taxpayer respected the restrictions placed on the trust's

operation as set forth in the trust documents.  See <u>Muhich v. Commissioner</u>, T.C. Memo. 1999-192, affd. 238 F.3d 860 (7th Cir. 2001).  As discussed below, each of these factors supports a conclusion that Linmar Trust had no economic substance.

A.   <u>Mr. Marlin's Relationship to the Transferred Property Before and After Linmar's Creation</u>

With respect to the first factor, the Court looks to the economic reality of a purported arrangement to determine who is the settlor of a trust, whether or not named as settlor in the related documents.  <u>Zmuda v. Commissioner</u>, <u>supra</u> at 720.  Mr. Grisby and Ms. Cahill signed the Linmar Trust contract as exchanger and creator, respectively.  Neither Mr. Grisby nor Ms. Cahill was called as a witness.  The Court infers that their testimony would not have been favorable to Mr. Marlin.  See <u>Wichita Terminal Elevator Co. v. Commissioner</u>, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).  Petitioners have presented no evidence that either Mr. Grisby or Ms. Cahill had any participation in Linmar's existence after its formation. From the record it appears that Mr. Grisby and Ms. Cahill acted as "straw men" to form Linmar Trust.[7]

Mr. Marlin contributed four parcels of real estate to Linmar.  Petitioners colored the transaction as a sale by having

_____

[7]Black's Law Dictionary 1421 (6th ed. 1990) defines "straw man" as "A 'front'; a third party who is put up in name only to take part in a transaction. * * * Person who purchases property for another to conceal identity of real purchaser, or to accomplish some purpose otherwise not allowed."

Linmar Trust provide Mr. Marlin a promissory note. The only evidence petitioners presented that payments were made on the note is a canceled check dated August 18, 1999, and made out to "Global Business Serv. Trust Acct." in the amount of $2,165, which is the amount of the monthly installments required by the promissory note. "Meadow Brook" was written on the memo line. This purported payment on the note was made more than 6 years after the transfer. Petitioners also suggest that the note was paid off in the amount of $193,377 as part of Linmar's sale of the Olive Street property in 1999. The payment was allegedly made to Meadow Brook Investments. As evidence of this payment, petitioners direct the Court to a disbursement summary from the sale of the Olive Street property showing payment to Meadow Brook Investments and a letter from Meadow Brook Investments showing a payoff amount of $193,377.

However, petitioners have not presented any evidence of when or for what consideration Mr. Marlin transferred the note to Meadow Brook Investments. In short, there is no evidence that Linmar made any payment to Mr. Marlin on the note or that Meadow Brook paid Mr. Marlin any amount in exchange for the note. That a taxpayer would transfer four valuable parcels of real estate to a trust for no value while retaining no control over the real estate is not plausible. Accordingly, the Court finds that the

transfer of the four parcels of real estate was not a sale.[8]  See
Gouveia v. Commissioner, T.C. Memo. 2004-256.

After the transfer of the real estate to Linmar, the use of
the properties did not change.  Mr. Marlin resided at the North
Church Street address before and after Linmar's formation.  Mr.
Marlin owned Marlin Mechanical and Marlin Contractors, and each
used the Avenue 296 addresses before and after Linmar's
formation.

The financial accounts of Mr. Marlin, Mr. Marlin's
businesses, and Linmar Trust were commingled.  As manager of
Linmar Trust, Mr. Marlin had authority to conduct Linmar's day-
to-day operations.  Rents were deposited into Linmar's accounts
on which Mr. Marlin was a signatory.  The record shows that Mr.
Marlin had unfettered access to Linmar's funds.  Furthermore, the
record indicates that Mr. Marlin and not the purported trustees
made all decisions relating to the transferred properties.

The Court concludes that after their transfer to Linmar, Mr.
Marlin's relationship to the transferred properties did not
change in any material way.  Accordingly, this factor points to a
sham.

---

[8]Although certainly not dispositive, the Court recognizes
that the name "Linmar" is the reverse of the syllables of
"Marlin".  Petitioners offered no explanation as to why the
trust's name so closely resembles Mr. Marlin's name.

B.    The Independence of Linmar's Trustees

The failure of a nominal trustee to have any meaningful role in the operation of the trust has been repeatedly cited by this Court as evidence that the entity lacks economic substance.  See, e.g., Zmuda v. Commissioner, 79 T.C. at 720-721; Para Techs. Trust v. Commissioner, T.C. Memo. 1994-366, affd. without published opinion sub nom. Anderson v. Commissioner, 106 F.3d 406 (9th Cir. 1997).

During the years at issue Linmar's trustees were Winnie McGuire, who was Mr. Marlin's wife; Eileen McGuire, who is Winnie McGuire's daughter; and Ms. Costa, who is either Mr. Marlin's wife or familiar enough with Mr. Marlin that they refer to each other as husband and wife.  Ms. Remillard, who was Linmar's secretary and financial agent, and Eileen McGuire both testified that Mr. Marlin made all decisions with respect to Linmar Trust.

Neither petitioner presented evidence that Winnie McGuire or Eileen McGuire acted independently.  Eileen McGuire testified that she did not know Linmar's purpose, she did not take part in decisionmaking with respect to Linmar, and she did not have any involvement with Linmar's real estate or business operations. When asked about the extent of her participation in the trust, she stated:  "I just signed papers occasionally, didn't really understand what they were or question it."  Eileen McGuire also

testified that she believed Mr. Marlin was the beneficiary of the Trust.

Neither petitioner presented any evidence that Ms. Costa acted independently. Ms. Costa did not testify at trial. The Court infers that her testimony would not have been favorable to Mr. Marlin. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. at 1165.

The Court concludes that during the years at issue Linmar did not have an independent trustee and that decisions with respect to Linmar were made by Mr. Marlin. Accordingly, this factor points to a sham.

C.   Economic Interests Passed to Beneficiaries

In determining to whom economic interests passed, this Court has considered whether a taxpayer identified the ultimate beneficiary, or holder of certificates of beneficial interest. See Gouveia v. Commissioner, supra. Petitioners claim that during the years at issue Linmar's beneficiary was either Redondo Enterprises or Nevet's Investments. None of Linmar's representatives know anything about Redondo Enterprises or Nevet's Investments other than their names and addresses. That neither Mr. Marlin, who is intimately involved with the trust, nor Mr. Parsons, Linmar's current trustee, would know anything about the trust's beneficiary other than its name and address is

not plausible.  Furthermore, Linmar's trustee during the years at issue believed that Mr. Marlin was the beneficiary.

Petitioners claim that in November 1999, Linmar wrote a check for $400,000 to Nevet's Investments.  However, the check is paid to the order of Anglo Irish Bank.  Nevet's Investments is only written on the memo line.  There is no evidence that Nevet's Investments received any benefit from the check.  In fact, other than their own uncorroborated testimony, neither Mr. Marlin nor Mr. Parsons presented any evidence that the purported beneficiaries even exist.

Furthermore, under the terms of the Linmar contract, it is unclear whether Linmar has a beneficiary at all.  The contract states that the trustees "shall continue to conserve and protect the assets, and initiate, continue, extend or discontinue any venture or investment at their sole discretion for the benefit of the Trust."  A trust exists for the benefit of its beneficiaries, not for its own benefit.  Petitioners also state that the Trust's purpose is to "protect the Trust assets from suitors, spend thrift relatives, and probate."  These are the purposes of individuals, not business organizations such as Linmar's purported beneficiaries.

The Court also notes that the transfer of property to Linmar did not create any rights in anyone else with respect to the transferred property.  The Linmar Trust contract states that

"Ownership of capital units does not entitle such owner to any title, legal or equitable, nor to any management powers or rights to or in, any assets or income of the Trust." The contract also states that a capital unit holder's death or termination does not create any rights in Linmar or its assets:

> All rights of a Capital Unit Holder terminate upon the death of that Holder, such rights automatically reverting to the Trustees hereof. The death, insolvency or bankruptcy of any Capital Unit Holder shall not operate to dissolve, terminate or in any other manner affect this Trust nor any of its operations or affairs nor may the heirs, legal representatives, or transferees of said Holder demand a division of property of the Trust, nor any special accounting, nor any rights whatsoever.

The agreement gives the beneficiaries a right to annual income, and, upon termination, trust assets. However, these rights are illusory because the trustees are given broad discretion to determine what constitutes corpus, income, and net distributable income to the capital unit holders. In fact, despite the fact that Linmar reported distributable net income in 2001, 2002, and 2003, the record is devoid of any evidence that distributions were made to the beneficiaries or that the beneficiaries waived their rights to distributions.

The trustees also have authority to amend the contract, terminate the trust, or extend the trust's term. The agreement clarifies that the trustee's discretion is absolute. "The trustees have exclusive power to construe the meaning and intent of this contract. * * * Such construction is conclusive, legally

binding and will govern." Such unbridled power gives taxpayer-trustees the same control over property as they enjoyed before the formation of the trust. See <u>Markosian v. Commissioner</u>, 73 T.C. at 1244; <u>Castro v. Commissioner</u>, T.C. Memo. 2001-115. As stated previously, Linmar had no independent trustee, and for all intents and purposes, Mr. Marlin functioned as Linmar's trustee, making all decisions.

Petitioners have not proven that anyone other than Mr. Marlin and his immediate family received an economic benefit from Linmar Trust. Accordingly, this factor points to a sham.

### D. Restrictions Imposed by Linmar Trust or by the Law of Trusts

The record shows that neither the Linmar contract nor trust law restricted Mr. Marlin's use of the transferred property. To the extent that the Linmar contract required certain procedures or actions, there is no evidence that the contract was followed. For example, there is no evidence that the trustees approved all real estate transactions and contracts as required by the Linmar contract. All evidence indicates that Mr. Marlin made those decisions without trustee approval. Mr. Marlin's unrestricted use of trust property indicates that he was not restrained in any meaningful manner, including fiduciary restraints. Accordingly, this factor points to a sham.

E.    Conclusion

Petitioners have provided no evidence that Linmar had a valid business purpose or was anything more than a vehicle for Mr. Marlin to conduct his business and personal affairs to evade Federal income taxes.  In substance, Mr. Marlin remained the owner of the properties purportedly transferred to Linmar and is taxable on the income derived therefrom.  After considering the four factors above, the Court concludes that Linmar Trust lacked economic substance and must be disregarded for Federal income tax purposes.[9]

III. The Amount of Income Attributable to Mr. Marlin

When a taxpayer fails to maintain or produce adequate books and records, the Commissioner is authorized under section 446 to compute the taxpayer's taxable income by any method that clearly reflects income.  Holland v. United States, 348 U.S. 121, 130-132 (1954); Meneguzzo v. Commissioner, 43 T.C. 824, 831 (1965).  The Commissioner has great latitude in selecting a method for reconstructing a taxpayer's income, and the method need only be reasonable in light of all the surrounding circumstances.  This Court has long accepted the bank deposits method of income reconstruction.  Nicholas v. Commissioner, 70 T.C. 1057, 1064-

---

[9]In light of our holding, the Court need not address respondent's alternative arguments that Linmar's income should be allocated to Mr. Marlin under the assignment of income doctrine or the grantor trust rules.  See Gouveia v. Commissioner, T.C. Memo. 2004-256 n.28; Castro v. Commissioner, T.C. Memo. 2001-115 n.12.

1065 (1978). While not conclusive, bank deposits are prima facie evidence of income. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). Mr. Marlin bears the burden of proving respondent's determinations are erroneous, and with respect to the bank deposits analysis, must show the deposits came from a nontaxable source. See Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933); Harper v. Commissioner, 54 T.C. 1121, 1129 (1970).

Neither petitioner introduced evidence that contemporaneous books and records were maintained. Respondent used a combination of the specific items and bank deposits methods to determine Mr. Marlin's unreported income. Respondent determined Mr. Marlin's unreported gross receipts that should have been reported on Schedule C, Profit or Loss from Business; rental income that should have been reported on Schedule E, Supplemental Income and Loss; and interest income by comparing the results of the specific items and bank deposits analyses with Linmar Trust's tax returns. Mr. Marlin provided no evidence that respondent's calculations were incorrect or that any of the deposits were nontaxable.[10] Respondent properly took into account income reported on Linmar's returns and Mr. Marlin's specific items of income to prevent the double counting of that income.

Respondent also determined that Mr. Marlin received $720,000 of capital gain from the sale of the Olive Street property. The

_____

[10]Before trial respondent conceded $90,000 of gross receipts for 2003 because it was a nontaxable transfer.

gain from the sale of property is equal to the excess of the amount realized therefrom over the adjusted basis of the property.  Sec. 1001(a).  Mr. Marlin admits the amount realized on the sale was $720,000.  A taxpayer must establish his cost or adjusted basis for the purpose of determining gain or loss that he must recognize on a sale of property.  O'Neill v. Commissioner, 271 F.2d 44, 50 (9th Cir. 1959), affg. T.C. Memo. 1957-193.  Taxpayers who fail to prove a basis in a sold asset are considered to have a zero basis in that asset.[11]  Garrett v. Commissioner, T.C. Memo. 1997-231.

Mr. Marlin presented no evidence of his basis in the Olive Street property and is therefore considered to have a zero basis.  Accordingly, he received $720,000 of capital gain on the sale of the Olive Street property.

IV.  Self-Employment Tax

Respondent determined that Mr. Marlin is liable for self-employment tax under section 1401 for each of the years at issue.  Section 1401 imposes a tax on the self-employment income of

---

[11]In certain circumstances, the Court may use the Cohan rule to estimate a taxpayer's basis in an asset at the time of transfer.  Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930).  For the Court to estimate basis, the taxpayer must provide some reasonable evidentiary basis for the estimation.  Polyak v. Commissioner, 94 T.C. 337, 345 (1990); Vanicek v. Commissioner, 85 T.C. 731, 743 (1985).  Mr. Marlin has not provided any basis that would permit a reasonable estimate of his basis in the Olive Street property.

individuals.  Self-employment income means the net earnings from self-employment derived by an individual.  Sec. 1402(b).

Mr. Marlin presented no evidence that would indicate the Schedule C gross receipts he received are not self-employment income.  Therefore, he is liable for self-employment tax on that income for the years at issue.[12]

V.   Deductions

Linmar Trust claimed deductions on its Schedules C and Schedules E during the years at issue.  Respondent did not allow Mr. Marlin any deductions other than the standard deduction and the deduction for self-employment tax.  Deductions are a matter of legislative grace, and a taxpayer bears the burden of proving that he has complied with the specific requirements for any deduction he claims.  INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934); see also Rule 142(a).  Mr. Marlin has presented no evidence that would indicate he is entitled to any deductions beyond those determined by respondent, nor has he provided the Court any reasonable factual basis upon which the Court may estimate his allowable deductions under Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930).  Therefore, he is not entitled to any deductions beyond those determined by respondent.

_____

[12]For each of the years at issue, respondent allowed Mr. Marlin a deduction for one-half of the self-employment tax under sec. 164(f).

VI.  Additions to Tax

A.  Burden of Proof

The Commissioner bears the initial burden of production with respect to a taxpayer's liability for additions to tax under sections 6651(a)(1) and (2) and 6654(a).  Sec. 7491(c); Rule 142(a); Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).  To meet this burden, the Commissioner must come forward with sufficient evidence indicating it is appropriate to impose the additions to tax.  Higbee v. Commissioner, supra at 446-447.  The taxpayer bears the burden of proof as to any exception to the additions to tax.  See sec. 7491(c); Rule 142(a); Higbee v. Commissioner, supra at 446-447.

B.  Section 6651(a)(1) Addition to Tax

Section 6651(a)(1) imposes an addition to tax for failure to file a return on the date prescribed (determined with regard to any extension of time for filing) unless the taxpayer can establish that such failure is due to reasonable cause and not due to willful neglect.

Mr. Marlin claims he failed to file tax returns for the years at issue because he reasonably relied on the advice of a tax professional who stated that he did not have sufficient income to require filing a return.  Mr. Marlin presented no evidence of his adviser's expertise, nor did he present any evidence that the adviser was provided all necessary and accurate

information.  If a competent adviser had been presented all of Mr. Marlin's tax information, that adviser could not have reasonably advised Mr. Marlin not to file a return.  Therefore, the Court holds that Mr. Marlin did not have reasonable cause for his failure to file the returns at issue.

C.    Section 6651(a)(2) Addition to Tax

Section 6651(a)(2) imposes an addition to tax of 0.5 percent per month (up to a maximum of 25 percent) for failure to make timely payment of the tax shown on a return unless the taxpayer shows that the failure is due to reasonable cause and not due to willful neglect.  The addition to tax applies only when an amount of tax is shown on a return.  Cabirac v. Commissioner, 120 T.C. 163, 170 (2003).  Under section 6651(g), a return prepared by the Secretary pursuant to section 6020(b) is treated as a return filed by the taxpayer for the purpose of determining the amount of an addition to tax under section 6651(a)(2).  For these purposes, a section 6020(b) return, in the context of section 6651(a)(2) and (g)(2), "must be subscribed, it must contain sufficient information from which to compute the taxpayer's tax liability, and the return form and any attachments must purport to be a 'return'."  Spurlock v. Commissioner, T.C. Memo. 2003-124; see also Cabirac v. Commissioner, supra at 170-171. Respondent prepared substitute returns that satisfied the requirements of sections 6651(a)(2) and (g)(2) and 6020(b).  Mr.

Marlin has not paid the tax due and has not established that his failure to timely pay was due to reasonable cause.

    D.   <u>Section 6654 Addition to Tax</u>

Section 6654(a) imposes an addition to tax on an underpayment of estimated tax unless one of the statutory exceptions applies. See sec. 6654(e). The addition to tax is calculated with reference to four required installment payments of the taxpayer's estimated tax liability. Sec. 6654(c)(1); <u>Wheeler v. Commissioner</u>, 127 T.C. 200, 210 (2006), affd. 521 F.3d 1289 (10th Cir. 2008). Each required installment of estimated tax is equal to 25 percent of the "required annual payment." Sec. 6654(d)(1)(A). The required annual payment is generally equal to the lesser of (1) 90 percent of the tax shown on the individual's return for that year (or, if no return is filed, 90 percent of his or her tax for such year), or (2) if the individual filed a return for the immediately preceding taxable year, 100 percent of the tax shown on that return. Sec. 6654(d)(1)(B); <u>Wheeler v. Commissioner</u>, <u>supra</u> at 210-211. A taxpayer has an obligation to pay estimated taxes for a particular year only if he has a "required annual payment" for that year. <u>Wheeler v. Commissioner</u>, <u>supra</u> at 211. The required annual payment is determined with respect to the tax liability shown on the taxpayer's return for the preceding year even when the return for the previous year fraudulently understates income,

or was filed late. Mendes v. Commissioner, 121 T.C. 308, 324 (2003).

Mr. Marlin did not file returns for 1998, 1999, 2001, 2002, or 2003, nor did he pay estimated tax in any of those years. However, Mr. Marlin's 2000 Form 4340, Certificate of Assessments, Payments, and Other Specified Matters, indicates that he filed a return for 2000 which reported zero tax due. Respondent later determined that Mr. Marlin owed $90,671 in income tax for 2000. Nevertheless, Mr. Marlin filed a return for 2000, and the required annual payment for 2001 is limited to 100 percent of the tax shown on the 2000 return; i.e., zero. Accordingly, Mr. Marlin is not liable for an addition to tax under section 6654 for 2001. See Wheeler v. Commissioner, supra at 212; Mendes v. Commissioner, supra at 324.

Mr. Marlin did not file returns for the other years at issue or for the immediately preceding years, and he did not pay estimated tax in those years. Therefore, Mr. Marlin is liable for additions tax under section 6654 for 1999, 2002, and 2003 calculated with respect to the required annual payments; i.e., 90 percent of the tax due for the respective years.

In reaching the holdings herein, the Court has considered all arguments made, and to the extent not mentioned above, concludes they are moot, irrelevant, or without merit.

To reflect the foregoing,

Decision will be entered for

petitioner in docket No. 18743-06.

Decision will be entered

under Rule 155 in docket No.

19283-06.
