T.C. Memo. 2018-66

UNITED STATES TAX COURT

FULL-CIRCLE STAFFING, LLC, WATCHMAN INVESTMENT TRUST,
FINANCIAL & TAX SERVICES, INC., TRUSTEE, TAX MATTERS
PARTNER, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 12883-15, 17279-15,           Filed May 17, 2018.
            17280-15, 17281-15,
            17282-15, 21187-15,
            5053-16.

_____

[1]Cases of the following petitioners are consolidated herewith: Professional Cargo Services USA Ltd., Watchman Investment Trust, Financial & Tax Services, Inc., Trustee, A Partner Other Than the Tax Matters Partner, docket No. 17279-15; Watchman Investment Trust, Financial & Tax Services, Inc., Trustee, docket No. 17280-15; Auzano Pro LLC, Watchman Investment Trust, Financial & Tax Services, Inc., Trustee, A Partner Other Than the Tax Matters Partner, docket No. 17281-15; Gulf Cargo Group LLC, Watchman Investment Trust, Financial & Tax Services, Inc., Trustee, A Partner Other Than the Tax Matters Partner, docket No. 17282-15; Richard T. Pudlo and Mitzi M. Pudlo, docket No. 21187-15; and Lighthouse Foundation, Richard Pudlo, Trustee, docket No. 5053-16.

**[\*2]**    Richard Ohendalski (an officer), for petitioners in docket Nos. 12883-15, 17279-15, 17280-15, 17281-15, and 17282-15.

R. Rene Escobedo, for petitioners in docket Nos. 21187-15 and 5053-16.

Ashley V. Targac, Roberta L Shumway, and Christopher C. Fawcett, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


GOEKE, Judge:  The issue before us in these consolidated cases is the taxation of income generated by four partnerships that were majority owned by Watchman Investment Trust (Watchman).  Respondent's primary argument is that Watchman is a sham and should be disregarded for Federal tax purposes and its shares of the partnership income are taxable to Richard T. Pudlo and Mitzi M. Pudlo.  He determined income tax deficiencies against the Pudlos of $30,557, $519,232, $988,543, $654,413, $226,989, and $42,780, for 2007, 2008, 2009, 2010, 2011, and 2012, respectively, and section 6663 fraud penalties for each year. In his answer he asserted a section 6662 accuracy-related penalty against the Pudlos for each year at issue.[2]

_____

[2]All section references are to the Internal Revenue Code (Code) in effect for
(continued...)

[*3]   Respondent advances two alternative deficiency determinations.  If we respect Watchman's existence, he determined income tax deficiencies against Lighthouse Foundation (Lighthouse), Watchman's sole beneficiary, for 2006 through 2012 on the basis of the amounts that Watchman deducted as income distributions to Lighthouse.  He also determined section 6651(a)(1) additions to tax for its failure to file timely and section 6651(a)(2) additions to tax for its failure to pay tax timely against Lighthouse for 2006 through 2012.  The alternative deficiency determination results from respondent's position that Watchman deducted income distributions to Lighthouse in excess of the amount that it actually distributed.  If we find that Lighthouse is taxed only on the amounts that it actually received from Watchman rather than the full amount of Watchman's income distribution deductions, respondent determined income tax deficiencies against Watchman for 2007 through 2012 on the basis that its income distribution deductions should be limited to the actual amounts distributed.  He also determined section 6663 fraud penalties or, alternatively, asserted section 6662(a) accuracy-related penalties against Watchman for 2007 through 2012.  Respondent concedes that if Watchman is disregarded and the income is taxed to

---

²(...continued)
the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all monetary amounts to the nearest dollar.

[*4] the Pudlos, the Pudlos are entitled to charitable contribution deductions for amounts contributed to charity through Lighthouse subject to the limitations of section 170.

Respondent also issued notices of final partnership administrative adjustment (FPAAs) to four partnerships in which Watchman was a majority partner: Professional Cargo Services USA, Ltd. (Limited), for 2007 through 2012, Full-Circle Staffing, LLC (Full-Circle), for 2007 through 2012, Gulf Cargo Group, LLC (Gulf Cargo), for 2012, and Auzano Pro, LLC (Auzano Pro), for 2012. We refer to Limited, Full-Circle, Gulf Cargo, and Auzano Pro, collectively, as the partnerships or the four partnerships. In the FPAAs respondent did not make adjustments to the income reported by the four partnerships. He determined that Watchman was a sham and that Mr. Pudlo was the true owner of the partnership interests purportedly owned by Watchman. He also determined a section 6663 fraud penalty or, alternatively, asserted a section 6662(a) accuracy-related penalty with regard to the partnership items at the partner level for each year at issue.

Respondent has conceded the section 6663 fraud penalties against the Pudlos, Watchman, and the partnership items from the four partnerships and the section 6662 accuracy-related penalties against Watchman and the four partnerships. The normal three-year period of limitations bars the assessment of

**[*5]** tax or the review of partnership item against the Pudlos for 2007 through 2010 unless an exception applies.[3] See sec. 6501(a).

The issues for consideration are: (1) whether Watchman's income is taxable to the Pudlos; we hold it is; (2) whether the statute of limitations bars review of the partnership items or the assessment of tax against the Pudlos for any year at issue; we hold it does not; (3) whether the Pudlos are liable for section 6662(a) accuracy-related penalties; we hold they are not. As we hold that the Pudlos are subject to tax on the income reported by the partnerships, we do not consider respondent's alternative determinations against Watchman and Lighthouse.

FINDINGS OF FACT

The Pudlos resided in Texas when they filed their petition. Lighthouse, Limited, Full-Circle, Gulf Cargo, and Auzano Pro had their principal places of business in Texas. Watchman filed the petitions for Limited, Gulf Cargo, and Auzano as a partner other than the tax matters partner and for Full-Circle as its tax matters partner. Watchman has a mailing address in Texas.

---

[3]The statute of limitations is also at issue for respondent's alternative determinations against Lighthouse and Watchman. However, these issues are moot as we sustain respondent's deficiency determinations against the Pudlos and do not consider respondent's alternative arguments determining deficiencies against Watchman or Lighthouse.

[*6] I.     Background

In May 1988 after working in the industry for a short time Mr. Pudlo started a freight forwarding business as a sole proprietorship called Pro Cargo. A few months later in August 1988 he incorporated the business as Professional Cargo Services, Inc. (Pro Cargo), an S corporation for Federal income tax purposes. Pro Cargo transported freight by air or by sea throughout the world using common carriers and transported freight by truck in the United States, Canada, and Mexico. Its clients were primarily overseas forwarding agents. Pro Cargo relied on third-party contractors to provide freight forwarding services to its clients. The Pudlos were each 50% shareholders. Mr. Pudlo was its president and manager. He managed its affairs, maintained its books and records, and controlled its finances and bank accounts. He had sole responsibility for setting wages and hiring and firing employees. He understood that Pro Cargo's income and expenses passed through to him and his wife on their joint income tax returns.

After organizing Pro Cargo Mr. Pudlo expanded his business to take advantage of additional opportunities in the international freight industry, including freight consolidation and packing. In 2000 or 2001 Mr. Pudlo started a freight consolidation business, Sea Wings, Inc. (Sea Wings), a C corporation. Mr. Pudlo was the president. Freight consolidation involves the consolidation of

[*7] goods among freight forwarding companies and others to build a full container for shipment. Mr. Pudlo believed that by combining Pro Cargo's and Sea Wings' freight and increasing the volume of freight, he could negotiate lower rates from sea freight carriers and increase the profits of both companies.

## II.     Business Restructuring

Before 2003 the Pudlos and their business underwent a prolonged Internal Revenue Service (IRS) audit that resulted in no significant adjustments to their income tax liabilities. Around that time Mr. Pudlo met Richard Ohendalski, a certified public accountant (C.P.A.) with the Legacy Group.[4] The Legacy Group provided tax planning advice and consulting on business operations, business structure, and debt relief. Attorneys and C.P.A.s working with the Legacy Group in addition to Mr. Ohendalski assisted in providing Mr. Pudlo with tax and business advice. The Legacy Group advisers recommended that the Pudlos create a limited partnership to operate the freight business, retaining a 5% interest in the partnership and organizing a trust to hold the remaining ownership. The Pudlos wanted to donate a portion of their business profits to charity anonymously. The Legacy Group recommended that the Pudlos form a nonexempt charitable trust to

[4]The name and ownership of the Legacy Group has changed during the course of Mr. Pudlo's relationship with it. For simplicity, we refer to the firm and its successors as the Legacy Group.

**[*8]** receive the income from the business and to donate the money to charity. The Legacy Group recommended an attorney, John Fant, to assist with the formation of these entities. Sometime after advising the Pudlos Mr. Ohendalski lost his C.P.A.'s license because he failed to file his income tax returns. He sold his ownership interest in the Legacy Group to an employee, Paul Alexander, and the Legacy Group ultimately terminated its working relationship with Mr. Ohendalski. Mr. Ohendalski did not prepare or sign the returns for the Pudlos, the partnerships, Watchman, or Lighthouse for the years at issue.

Following the Legacy Group's advice, the Pudlos formed three entities: (1) Watchman, an irrevocable trust, on May 28, 2003, (2) Lighthouse, a nonexempt charitable trust, on June 2, 2003, and (3) Limited, a limited partnership, on June 9, 2003. Mr. Fant drafted the trust documents and named himself Watchman's creator in the trust documents. Mr. Pudlo suggested Watchman's name. The Pudlos were each 50% beneficiaries at its formation. Mrs. Pudlo's mother was named the trust's protector. The Pudlos acquired their beneficial interests for $1 each and donated their interests to Lighthouse shortly thereafter. Financial & Tax Services, Inc. (F&T Services), was Watchman's initial

[*9] trustee and served as trustee during the years at issue.[5] Mr. Ohendalski was F&T Services' president. The trust agreement provides that Watchman's purpose was the "better protection of property and assets, dependable insulation against liability, simplified distribution of property and assets, efficient asset structure, privacy in investments, and greater ease in managing capital resources." It also provides that the beneficiary had the right to receive a disbursement from the trust when the trustee declared a distribution. The agreement grants sole discretion to the trustee to declare or to pay distributions to the beneficiary. It characterizes the trust distributions as "in the nature and form of a royalty, and not a dividend." The agreement also restricts loans of the trust principal or income without adequate consideration, security, or interest.

The Pudlos formed Lighthouse as a way to make anonymous charitable donations and decided upon its name together. They are Lighthouse's creators and joint trustees. They transferred their beneficiary interests in Watchman to Lighthouse on the date they formed Lighthouse. Lighthouse was Watchman's sole beneficiary during the years at issue. Its assets consisted solely of cash. Mr. Pudlo managed Lighthouse, maintained its books and records, and prepared its

---

[5]Financial & Tax Services, Inc., was also a predecessor name of the Legacy Group.

[*10] financial statements. As trustees the Pudlos determined the recipients and the amounts of Lighthouse's charitable donations. Because Watchman did not have a bank account, to make a distribution to Lighthouse Mr. Pudlo would issue a check from one of the partnerships payable to Watchman. Watchman's trustee would endorse the check over to Lighthouse and return it to Mr. Pudlo who would deposit the check into Lighthouse's bank account. Through Lighthouse the Pudlos donated generously to charity. From 2007 through 2012 Lighthouse donated over $900,000 to charity, which is over 11% of its share of the income from the four partnerships.

The Pudlos formed Limited as the new operator of the freight business. Watchman acquired a 94% limited partnership interest in Limited upon its formation. Watchman did not contribute any assets or services to Limited in exchange for its partnership interest. The Pudlos were each 2.5% limited partners. Pro Cargo continued in existence as Limited's 1% general partner and its tax matters partner. When the Pudlos formed Limited, Pro Cargo ceased its business operations as a freight forwarder. Limited began to handle the freight business, and Pro Cargo's clients became Limited's clients without notice to the clients. Limited did not pay Pro Cargo for any of its customer accounts. Pro Cargo's employees became Limited's employees. After Limited took over the freight

[*11] business Pro Cargo did not have any employees except for Mr. Pudlo, its president. Limited used the same property that Pro Cargo had used as its principal place of business. That property was owned by Mr. Pudlo's wholly owned corporation RIMJA Investment Management Co. (RIMJA).

Mr. Pudlo continued to control the freight business after Limited's organization. Limited's partnership agreement provides that Watchman does not have the right to take part in the management or control of the partnership, its business, or its affairs. Mr. Pudlo understood that Limited's income would be reported to its partners, but Limited did not have to actually distribute the income to its partners. He understood that as Limited's president he had discretion to decide whether to make cash distributions to the partners. He wanted to retain the business' profits and use the money to expand the business. He maintained records of Limited's distributions to Watchman. He made employee hiring and compensation decisions, controlled Limited's budget, and controlled the preparation of its financial statements and its general ledger. At the time of trial the Pudlos' two adult children and their son-in-law worked at Limited. Mr. Pudlo understood that his children could take over Limited's management and assume control over the business. He recognized that giving up the business' ownership to Watchman did not affect his ability to control the business. Watchman did not

[*12] engage in any business activities. It did not participate in Limited's management or operations. Nor did its trustee, F&T Services. The trustee signed Watchman's returns and endorsed checks. The trustee generally did not review Limited's books and records and reviewed the records only after the IRS began its audit. The trustee did not have signature authority over Limited's bank accounts.

In 2005 and 2006 Mr. Pudlo formed three additional entities as Texas limited partnerships that were treated as partnerships for Federal income tax purposes: Full-Circle, on January 13, 2005, Gulf Cargo, on January 2, 2006, and Auzano Pro, on July 5, 2006. He formed these entities without the assistance of an adviser. Watchman owned a 99% limited partnership interest in each partnership, and Mr. Pudlo owned a 1% general partnership interest. Mr. Pudlo determined Watchman's percentage ownership of each partnership. Watchman did not contribute any assets or services to the partnerships in exchange for its interests. Mr. Pudlo was the manager of each partnership. He controlled their budgets, paid their bills, maintained their books and records, and had signature authority over their bank accounts. The partnerships did not have any other employees. During the years at issue Full-Circle provided payroll services to Limited and Sea Wings by contracting with an unrelated third party to provide payroll services; it did not provide payroll services to any other person or entity. Full-Circle issued payroll

[*13] checks to Limited's employees. Mr. Pudlo testified that he formed Auzano Pro to purchase, hold, and sell real estate. Its return for 2012, the only year for which it filed a return, did not report that it owned any land or held any assets. Mr. Pudlo formed Gulf Cargo to have an entity available for new business opportunities. It is the sole shareholder of Pro Cargo Canada, Ltd. (Pro Cargo Canada), and Sea Wings Canada, Ltd. (Sea Wings Canada). Mr. Pudlo directly or indirectly owned interests in the following companies involved in the freight forwarding industry: Pro Cargo UAE, LLC, Pro Cargo Canada, Pro Cargo Dubai, Sea Wings Canada, and Sea Wings USA (related entities). At Mr. Pudlo's direction Limited transferred a substantial portion of its earnings to his related entities. For example, in 2009 Limited transferred $2,948,101 of its net business income of $2,951,164 to Mr. Pudlo's related entities. There were no written debt instruments, interest charges, or repayment schedules for the transfers. By the end of 2012 (as reflected on its 2012 partnership tax return) Limited had transferred over $1 million to Pro Cargo, its 1% partner that conducted no business activities.

III.     Tax Returns

Before the business restructuring the Pudlos reported the income from the freight business on their joint tax returns as passthrough income from Pro Cargo. Afterwards Limited reported a substantial portion of the income from the freight

[*14] business as passthrough income to Watchman. Watchman reported the income, claimed deductions for income distributions to Lighthouse that offset the income, and reported little to no income tax liability on the income from the freight business. Lighthouse reported the passthrough partnership income as Watchman's beneficiary as nontaxable royalty income.[6] Lighthouse took the position that the partnership income was royalty income on the basis that Watchman was a nonvoting limited partner and lacked control over the partnerships. Watchman did not in fact make distributions to Lighthouse in the amounts that it claimed as income distribution deductions, however. As a result of this tax reporting there was little to no income tax liability on the income from the freight business. Petitioners did not introduce books and records or financial statements for the four partnerships, Watchman, or Lighthouse into the record.

A.    Pudlos' Joint Tax Returns

The Pudlos filed a joint income tax return for each year at issue prepared by Paul, Phipps & Co. (Paul, Phipps). On June 2, 2015, respondent issued a notice of deficiency to the Pudlos (Pudlo notice), determining that they failed to report

---

[6]Certain exempt organizations are subject to tax on unrelated business taxable income. Sec. 511. Royalty income is excluded from the definition of unrelated business taxable income. Sec. 512(b)(2). Lighthouse reported its beneficial shares of the partnerships' income as royalties and generally did not report unrelated business income for the years at issue.

[*15] income from the four partnerships on the basis that Watchman was a grantor trust and the income from the four partnerships was taxable to the Pudlos as the trust's grantors, as follows:

| Year | Income per return | Unreported income |
|------|-------------------|-------------------|
| 2007 | $221,483 | $134,757 |
| 2008 | 313,447 | 1,553,505 |
| 2009 | 461,050 | 2,901,259 |
| 2010 | 388,221 | 2,050,913 |
| 2011 | 261,448 | 872,825 |
| 2012 | 206,325 | 393,678 |

Respondent did not determine in the Pudlo notice that Watchman was a sham. He issued the Pudlo notice after the expiration of the normal three-year periods of limitations for 2007, 2008, 2009, and 2010.[7] Its timeliness for 2007 through 2009 depends on the applicability of the six-year period of limitations relevant where a taxpayer omits from gross income an amount in excess of 25% of the amount of gross income reported on the return (25% gross omission). Respondent's determinations support its applicability here. For 2007 the

---

[7]The Pudlos filed their joint income tax returns as follows: the 2007 return on September 24, 2008, the 2008 return on October 20, 2009, the 2009 return on September 22, 2010, the 2010 return on October 19, 2011, the 2011 return on October 16, 2012, and the 2012 return on September 17, 2013.

[*16] timeliness of the notice also depends on a written extension executed within the six-year period of limitations. For 2010 the timeliness of the notice depends on either a written extension or a 25% gross omission. The Pudlos executed Form 2848, Power of Attorney and Declaration of Representative, authorizing Wayne Paul and James Phipps of Paul, Phipps to act as their representatives for 2007 through 2012. On April 30, 2014, after the three-year limitations period expired for 2007 but before the six-year period expired, Mr. Phipps executed Form 872, Consent to Extend the Time to Assess Tax, to extend the limitations period to September 24, 2015. Within the three-year limitations period for 2010, Mr. Phipps executed a written extension to extend the 2010 limitations period to October 19, 2015. Respondent issued the Pudlo notice within the limitations period extended by written agreement for 2010 and within the three-year periods for 2011 and 2012.

B.    Partnerships' Tax Returns

Mr. Pudlo prepared the financial statements for the four partnerships and provided the information to the return preparers for use in the preparation of the partnership tax returns. The return preparers relied on the information that Mr. Pudlo provided. Mr. Pudlo has a college degree. He read tax articles but does not have any specialized knowledge or experience with tax. The return preparers did

[*17] not audit the partnerships' books and did not request any additional documentation from Mr. Pudlo. Respondent did not make any adjustments to the partnership income reported by the four partnerships.

The Legacy Group prepared Limited's partnership tax returns for 2007 through 2012 and Gulf Cargo's and Auzano Pro's returns for 2012. Gulf Cargo and Auzano Pro did not file partnership returns for 2008 through 2011 because of the preparer's misunderstanding that they were single-member entities wholly owned by Watchman, disregarded for Federal tax purposes, and not required to file returns. Instead, Watchman attached copies of Gulf Cargo's and Auzano Pro's partnership tax returns for 2008 through 2011 to its returns. The record does not contain any information relating to Gulf Cargo's or Auzano Pro's returns for 2007. Mr. Alexander, who owned the Legacy Group at the time of trial, signed Limited's returns as the preparer for 2007 and 2010 through 2012. He has been an enrolled agent since 2005. Limited was a client of Legacy Group when Mr. Alexander purchased the business. He prepared Limited's returns by relying on prior years' returns and prepared the returns in a manner consistent with the prior years' returns. He discovered the mistake with respect to Gulf Cargo's and Auzano Pro's ownership during the IRS audit. He prepared the 2012 returns for both entities in

[*18] accordance with the correct ownership but did not amend the prior years' returns for 2008 through 2011.

Paul, Phipps prepared Full-Circle's partnership tax returns for 2007 through 2012. Mistakes were made on the reporting of Full-Circle's ownership on its returns. The returns for 2007 through 2012 incorrectly reported that Watchman was a general partner and designated Watchman as the tax matters partner. The 2007 partnership return misidentified Watchman as a 100% partner, which if correct would have meant that a partnership tax return was not required. The returns for 2008 through 2011 misidentified Gulf Cargo, instead of Mr. Pudlo, as a 1% partner. The 2012 return correctly listed the ownership percentages as 99% for Watchman and 1% for Mr. Pudlo in accordance with the operating agreement; however, it incorrectly reported Watchman as the general partner and Mr. Pudlo as the limited partner. The Pudlos reported partnership income from Mr. Pudlo's 1% interest in Full-Circle only on their 2012 joint tax return.

On February 6, 2015, respondent issued FPAAs to Limited and Full-Circle for 2007 through 2012 and on March 25, 2015, to Gulf Cargo and Auzano Pro for 2012. He issued the FPAAs before the Pudlo notice. In the FPAAs respondent determined that Watchman was a sham but did not make any adjustments to the partnerships' reported income. He determined a fraud penalty and alternatively an

[*19] accuracy-related penalty with regard to partnership items at the partner level for each year at issue.

C.    Watchman's Tax Returns

Watchman filed income tax returns for 2007 through 2012 prepared by the Legacy Group on Form 1041, U.S. Income Tax Return for Estates and Trusts.  It reported its share of income or loss from the four partnerships,[8] total income,[9] income distribution deductions to offset a substantial part of its total income, and little to no income tax liability as follows:

| Year | Limited | Full-Circle | Gulf Cargo | Auzano Pro | Total income | Deductions | Tax |
|------|---------|-------------|------------|------------|--------------|------------|-----|
| 2007 | $110,718 | $40,442 | $7,472 | ($28,009) | $134,757 | $133,757 | $135 |
| 2008 | 1,385,494 | 135,481 | 36,069 | (6,163) | 1,553,505 | 1,551,000 | 381 |
| 2009 | 2,774,094 | 29,023 | 74,102 | 20,309 | 2,901,259 | 2,897,000 | 810 |
| 2010 | 1,831,914 | 115,579 | 10,054 | 46,307 | 2,050,913 | 2,050,000 | 122 |
| 2011 | 834,993 | 33,973 | (2,669) | 4,901 | 872,825 | 872,725 | -0- |
| 2012 | 13,978 | 369,009 | -0- | 10,331 | 393,678 | 393,578 | -0- |

---

[8]Although Gulf Cargo and Auzano Pro filed partnership tax returns only for 2012, Watchman listed the income or loss from both entities as partnership income or loss on its returns for 2007 through 2012.

[9]For each year Watchman also reported interest income in addition to the income or loss from the four partnerships, and for 2010 it reported capital gain.

[*20] The income distribution deductions did not represent amounts that Watchman actually distributed to Lighthouse as reflected by the deposits into Lighthouse's bank account set forth infra p. 21. From 2007 to 2012 Watchman's reported income from the partnerships was approximately $8 million, but it reported income tax liabilities of $1,448.[10]

For 2007 through 2012 Watchman issued Schedules K-1 (Form 1065), Partner's Share of Income, Deductions, Credit, etc., to Lighthouse for its beneficiary shares of Watchman's income. With the exception of 2007 Watchman characterized Lighthouse's beneficiary shares of the income on the Schedules K-1 as other portfolio and nonbusiness income (nonbusiness income). On the 2007 Schedule K-1, Watchman characterized Lighthouse's beneficiary share of its income as ordinary business income. Watchman reported Lighthouse's

_____

[10]In February 2017 before the trial in these cases Watchman filed amended trust tax returns for 2007 through 2012 that decreased the amounts of its income from the four partnerships. In May 2017 after the trial Lighthouse filed amended returns for 2006 through 2012 to reflect the amended Watchman returns and decreased the amounts of Lighthouse's shares of income as Watchman's beneficiary. Petitioners did not produce any evidence at trial to substantiate the amounts reported on the amended returns. Furthermore, their arguments to support the amounts of income reported on the amended returns are without merit.

[*21] beneficiary shares of its income and made deposits into Lighthouse's bank account as follows:

| Year | Income | Deposits |
|---|---|---|
| 2006 | $764,550 | $40,040 |
| 2007 | 133,757 | 60,000 |
| 2008 | 1,551,000 | 100,000 |
| 2009 | 2,897,000 | 105,008 |
| 2010 | 2,050,000 | 193,906 |
| 2011 | 872,725 | 212,355 |
| 2012 | 393,578 | 254,049 |
| Total | 8,662,610 | 965,358 |

Watchman reported Lighthouse's beneficiary share of income of over $8.5 million from 2006 to 2012 but transferred less than $1 million to it during that period. On June 2, 2015, respondent issued a notice of deficiency to Watchman for 2007 through 2012 (Watchman notice) that disallowed Watchman's income distribution deductions except to the extent of the distributions actually made to Lighthouse as reflected by deposits into Lighthouse's bank accounts.

D.    Lighthouse's Returns

Lighthouse filed Form 990-PF, Return of Private Foundation or Section 4947(a)(1) Nonexempt Charitable Trust Treated as a Private Foundation, reporting

[*22] its beneficiary share of Watchman's income for each year at issue. It reported the income as nontaxable royalty income. It accounted for the differences between its shares of Watchman's income and the amounts it received from Watchman as "beneficiary account credit[s] not received". The Legacy Group prepared Lighthouse's returns. Mr. Alexander prepared the returns for 2010 through 2012 and prepared the returns in the same manner as Lighthouse's prior years' returns. Mr. Pudlo, as a trustee of Lighthouse, provided the information to prepare Lighthouse's returns. On December 2, 2015, respondent issued a notice of deficiency to Lighthouse for 2006 through 2012 (Lighthouse notice).

OPINION

Respondent contends that the Pudlos created Watchman for tax-avoidance purposes, it is a sham, and it should be disregarded for Federal tax purposes. He issued the Pudlo notice more than three years after the Pudlos filed their joint tax returns for 2007 through 2010. He contends that the six-year period of limitations under section 6501(e) applies for 2007 through 2010 and written agreements extend the periods of limitations for 2007 and 2010. Application of the six-year limitations period depends on a finding that Watchman was a sham for Federal tax purposes and its income is directly taxable to the Pudlos. Respondent issued the Pudlo notice within the normal three-year period of limitations for 2011 and 2012.

**[\*23]** Respondent determined alternative deficiencies against Lighthouse and Watchman with respect to the same income that he seeks to tax to the Pudlos. Respondent is entitled to take inconsistent positions to assert a single income tax deficiency against multiple parties to protect the public fisc and ensure against a potential whipsaw effect.  See Fayeghi v. Commissioner, 211 F.3d 504, 508 n.3 (9th Cir. 2000), aff'g T.C. Memo. 1998-297; Doggett v. Commissioner, 66 T.C. 101, 103 (1976).

I.      Preliminary Matters

Petitioners contend that we should not consider respondent's argument that Watchman is a sham because respondent did not raise the argument in the Pudlo or the Watchman notice.  Nor did he raise that argument in his pleadings in the Pudlos' case.  They further argue that the Pudlo notice did not allege any conduct or activities by the Pudlos indicating that they contributed to or participated in a sham.  Respondent determined that Watchman is a grantor trust in the Pudlo notice and asserted it is a sham in the FPAAs issued to the four partnerships.  However, petitioners argue that respondent cannot rely on the FPAAs as a basis for asserting that Watchman is a sham because respondent did not determine any income adjustments in the FPAAs.  They also argue that we should not consider the accuracy-related penalties against the Pudlos on the basis of this reasoning.  In the

**[\*24]** alternative, petitioners argue that respondent should have the burden of proof in these cases with respect to whether Watchman is a sham and to the accuracy-related penalties.  We address the burden of proof with respect to the accuracy-related penalties infra part IV.

Petitioners contend that respondent's failure to assert that Watchman is a sham in the Pudlo notice raises questions with the notice's validity and our jurisdiction.  We have jurisdiction to redetermine a deficiency when the Commissioner issues a valid notice of deficiency and the taxpayer files a timely petition for a determination.  Stamm Int'l Corp. v. Commissioner, 84 T.C. 248, 252 (1985).  Section 7522(a) provides that a notice of deficiency "shall describe the basis for, and identify the amounts (if any) of, the tax due, interest, additional amounts, additions to the tax, and assessable penalties included in such notice."  It further provides that "[a]n inadequate description under the preceding sentence shall not invalidate such notice."  Id.  The Pudlo notice identifies the amounts of the tax deficiencies, the tax years at issue, and reasons for the adjustments.  We hold that the notice satisfies the requirements of section 7522.

Our jurisdiction is not limited to issues raised in the notice of deficiency.  See sec. 6214(a) (granting jurisdiction to redetermine the amount of the deficiency in an amount greater than the original determination in the notice of deficiency if

[*25] the Commissioner raises the issue at or before trial). A trial before the Court in a deficiency case is a de novo proceeding; our decision is based on the merits of the record before us and not on any previously developed administrative record. See Jackson v. Commissioner, 73 T.C. 394, 400 (1979); Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 327-328 (1974). While it is most appropriate for the Commissioner to assert his legal theories in the deficiency notice or in his pleadings, he is generally not precluded from advancing a new matter during the proceeding of the case unless it would cause taxpayers to suffer unfair prejudice or surprise. Dirico v. Commissioner, 139 T.C. 396, 415-417 (2012); Ware v. Commissioner, 92 TC. 1267, 1269 (1989), aff'd, 906 F.2d 62 (2d Cir. 1990). The Pudlos were not unduly prejudiced or surprised by the argument that Watchman is a sham. Respondent raised it in his pretrial memorandum; he alleged that all six entities, i.e., the four partnerships, Watchman, and Lighthouse, were shams. He asserted that Watchman was a sham in the FPAAs to the four partnerships, which he issued before the Pudlo notice. In their petition and pretrial memorandum the Pudlos identified as an issue whether Watchman was a sham. Accordingly, respondent may raise this argument against the Pudlos.

The timing of respondent's assertion that Watchman is a sham can affect which party has the burden of proof at trial. Generally, the Commissioner's

**[*26]** determinations in a notice of deficiency are presumed correct, and the taxpayer has the burden of proving that those determinations are erroneous.[11] Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). When the Commissioner raises a new matter at trial, he has the burden of proof with respect to the new matter. Rule 142(a)(1); Achiro v. Commissioner, 77 T.C. 881, 889-890 (1981). Treating the argument that Watchman is a sham as a new matter for which respondent has the burden of proof is not decisive in the Pudlos' case because our decision is based upon the preponderance of the evidence.[12] See Estate of Bongard v. Commissioner, 124 T.C. 95, 111 (2005). Nevertheless, respondent has clearly established that Watchman was a sham.

---

[11]The Court of Appeals for the Fifth Circuit, to which these cases are appealable, has stated that for the presumption of correctness to apply to the notice of deficiency in unreported income cases the Commissioner must provide "some predicate evidence" that connects the taxpayers with the income. Portillo v. Commissioner, 932 F.2d 1128, 1132-1134 (5th Cir. 1991), aff'g in part, rev'g in part T.C. Memo. 1990-68; see Sealy Power, Ltd. v. Commissioner, 46 F.3d 382, 386 (5th Cir. 1995), aff'g in part, rev'g in part, and remanding in part T.C. Memo. 1992-168. When the Commissioner produces sufficient evidence, the burden shifts to the taxpayers to come forward with evidence that the Commissioner's determinations are arbitrary or erroneous. Portillo v. Commissioner, 932 F.2d at 1133.

[12]Petitioners argue that respondent has the burden of proof. See sec. 7491(a) (shifting the burden of proof to the Secretary when the taxpayer produced credible evidence at trial, satisfied substantiation and record-keeping requirements, and cooperated with the Secretary's reasonable discovery requests). Petitioners have not met the requirements of sec. 7491.

**[*27]** II.     Whether Watchman Is a Sham

Respondent argues that Watchman should be disregarded as a separate entity for Federal tax purposes on the basis of three alternative arguments: (1) Watchman is a sham, (2) it is a grantor trust and its income is attributed to the Pudlos as the grantors, and (3) the Pudlos cannot assign their business income to Watchman.  He further argues that all of Watchman's purported income and deductions for 2007 through 2012 should be attributable to the Pudlos as the true owners of the four partnerships.

Taxpayers are generally free to structure their affairs to minimize taxes. Gregory v. Helvering, 293 U.S. 465 (1935).  However, taxpayers may not structure a paper entity to avoid tax when the entity lacks economic substance, and we may disregard a taxpayer's chosen business form where that form is a sham and inconsistent with economic reality.  Higgins v. Smith, 308 U.S. 473, 477 (1940); Zmuda v. Commissioner, 79 T.C. 714, 719 (1982), aff'd, 731 F.2d 1417 (9th Cir. 1984).  If a trust lacks economic effect and does not alter a cognizable economic relationship, the Court may ignore the trust as a sham and apply the tax law in accordance with the entity's substance.  Zmuda v. Commissioner, 79 T.C. at 720; Markosian v. Commissioner, 73 T.C. 1235, 1241 (1980).  A trust that is valid under State law may be disregarded for Federal income tax purposes if it lacks

[*28] economic reality.  <u>Zmuda v. Commissioner</u>, 79 T.C. at 720; <u>Markosian v. Commissioner</u>, 73 T.C. at 1241; <u>Furman v. Commissioner</u>, 45 T.C. 360, 364 (1966), <u>aff'd</u>, 381 F.2d 22 (5th Cir. 1967).  Whether a trust lacks economic substance is a question of fact.  <u>Paulson v. Commissioner</u>, T.C. Memo. 1991-508, <u>aff'd</u>, 992 F.2d 789 (8th Cir. 1993).

Petitioners contend that their business structure satisfies the three-prong test for economic substance set forth by the Court of Appeals for the Fifth Circuit, to which these consolidated cases are appealable, in <u>Klamath Strategic Inv. Fund ex rel. St. Croix Ventures v. United States</u>, 568 F.3d 537, 544 (5th Cir. 2009).  In <u>Klamath</u>, the Court of Appeals for the Fifth Circuit examined the economic substance of a business transaction; it did not address the question of whether a trust had economic substance.[13]  There is no indication that the Court of Appeals

---

[13]The Court of Appeals for the Fifth Circuit has interpreted the economic substance doctrine as a conjunctive three-factor test:  the transaction (1) has economic substance compelled by business or regulatory realities, an objective economic reality, (2) is imbued with tax independent considerations, a subjectively genuine business purpose, and (3) is not shaped totally by tax avoidance features.  <u>Klamath Strategic Inv. Fund ex rel. St. Croix Ventures v. United States</u>, 568 F.3d 537, 544 (5th Cir. 2009); <u>see Southgate Master Fund, LLC ex rel. Montgomery Capital Advisors, LLC v. United States</u>, 659 F.3d 466, 481 & n.41 (5th Cir. 2011).  Petitioners contend that their business structure had a reasonable possibility of making a profit, and Limited was in fact profitable, satisfying the first factor.  In addition, they argue that tax avoidance was not their sole motivation, the second and third factors, because Watchman and Limited had nontax purposes of asset

(continued...)

**[*29]** for the Fifth Circuit would apply the <u>Klamath</u> test in the question of the existence of a trust.

In deciding whether to disregard a trust for Federal tax purposes, we consider four factors relating to the trust to determine whether the trust lacks economic substance: (1) whether the taxpayer's relationship to the property transferred to the trust materially changed after the trust's creation; (2) whether the trust has an independent trustee; (3) whether an economic interest passed to other trust beneficiaries; and (4) whether the taxpayer feels bound by the restrictions imposed by the trust agreement or the law of trusts. <u>Markosian v. Commissioner</u>, 73 T.C. at 1243-1244. If a trust lacks economic substance apart from tax considerations, the trust is a sham and is not recognized for Federal tax purposes. See <u>Zmuda v. Commissioner</u>, 79 T.C. at 720-722; <u>Markosian v. Commissioner</u>, 73 T.C. at 1241; <u>Muhich v. Commissioner</u>, T.C. Memo. 1999-192, <u>aff'd</u>, 238 F.3d 860 (7th Cir. 2001). Consideration of each of these four factors supports a conclusion that Watchman lacks economic substance and is a sham.

---

[13](...continued)
protection, estate planning, and the reinvestment of profits to expand the business. They argue that some tax considerations are allowable by the <u>Klamath</u> test, and tax considerations may even be the predominant purpose.

**[\*30]** The first factor that we consider to determine whether a trust has economic substance is whether the grantor's relationship to the property transferred to the trust materially changed as a result of the trust's formation. Markosian v. Commissioner, 73 T.C. at 1243. We find that the Pudlos' control over the freight business did not materially change after Watchman's creation or after the transfer of ownership of the four partnerships to Watchman. While petitioners argue that the Pudlos did not have any control or significant ownership over the partnerships, we disagree. For purposes of the economic substance of a trust, the Court looks to the economic realities of the trust arrangement to determine who is the true creator, grantor, or settlor of the trust; we look beyond the named settlor to the true settlor. Zmuda v. Commissioner, 79 T.C. at 720-721. Watchman's formation documents identify Mr. Fant, the attorney who drafted the trust documents, as its creator. Mr. Fant did not transfer any property to the trust and did not participate in the trust in any way after its formation. Although the Pudlos were not named in the formation documents, each held a 50% beneficiary interest in Watchman at its formation. Mrs. Pudlo's mother was named protector. At formation Watchman's assets consisted solely of interests in Limited. Limited took over the freight business previously operated through Pro Cargo. The Pudlos, in effect, transferred their freight business to Watchman. Mr. Pudlo maintained the same control over

[*31] and access to the business as he had enjoyed when it operated as a corporation. The business had the same clients and operated in the same manner. Subsequently, Mr. Pudlo formed three additional partnerships with Watchman owning a 99% interest in each partnership. Mr. Pudlo had control over these three partnerships' activities and income. We find that the Pudlos were the true creators of Watchman. Watchman's purpose was to report the income from the partnerships on its tax returns and to claim income distribution deductions to offset the reported income irrespective of the amounts that it actually distributed to Lighthouse, thereby eliminating income tax on the Pudlos' freight business. The Pudlos' relationship with the business did not materially change as a result of the trust's formation. This factor supports a finding of a sham trust.

With respect to the second factor, we find that F&T Services was not an independent trustee. The failure of a trustee to have any meaningful role in the trust's operation is evidence that the trust lacks economic substance. Zmuda v. Commissioner, 79 T.C. at 720-721; Linmar Prop. Mgmt. Tr. v. Commissioner, T.C. Memo. 2008-219. An independent trustee would have prevented the Pudlos from acting against the interests of the beneficiaries. Markosian v. Commissioner, 73 T.C. at 1244. F&T Services was not involved in the partnerships' businesses and did not take part in decision making for the business. Mr. Ohendalski, who is

[*32] F&T Services' president and sole employee, did not testify. The Court may infer that his testimony would not have been favorable to petitioners. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), aff'd, 162 F.2d 513 (10th Cir. 1947). While the trust documents give the trustee sole discretion to make disbursements to the beneficiary, the trustee did not have discretion in a practical sense. Watchman did not have a bank account. The trustee did not have access to the partnerships' bank accounts and did not have any means to access Watchman's funds. Because Watchman did not have a bank account, the trustee could not even issue a check without Mr. Pudlo's consent. The trustee endorsed checks from the partnerships issued by Mr. Pudlo, made them payable to Lighthouse, and returned them to Mr. Pudlo, who deposited the checks into Lighthouse's bank account. Mr. Pudlo exercised control over the freight businesses and had sole discretion to distribute partnership funds to Watchman, which in effect controlled the trustee's ability to declare distributions to the beneficiary. Mr. Pudlo maintained complete access to and control over the partnerships' income and controlled when Watchman would receive funds. Mr. Pudlo, not the trustee, determined whether to distribute funds to Lighthouse and the amounts of the distributions. Although Mr. Ohendalski, president of F&T Services, signed Watchman's tax returns, he did not review the partnerships'

[*33] books and records until after the audit began, and he did not attend partnership meetings or perform any managerial tasks relating to the partnerships. Watchman's lack of an independent trustee indicates it is a sham.

As to the third factor, an economic interest did not pass to Watchman's named beneficiary, Lighthouse. The income of the partnerships remained under Mr. Pudlo's control, and he controlled contributions to Lighthouse. According to petitioners, the income from the freight business is not taxable because it was transferred to Lighthouse, a charitable foundation. However, in substantial part, the income was not transferred to Lighthouse. Rather, Mr. Pudlo transferred the income to his related entities. The distributions to Watchman and then to Lighthouse were only 11% of the partnerships' income. Mr. Pudlo had exclusive control over the partnerships' income and decided whether to distribute any income to Watchman. The Pudlos retained an economic interest in the trust assets; the assets did not pass to the trust beneficiary. This factor also supports respondent's argument.

Finally, under the fourth factor, we consider whether the Pudlos respected the restrictions placed on the trust assets by the trust documents or by law. Mr. Pudlo violated the only meaningful restriction in the trust agreement that prevents the loan of trust principal or income without adequate consideration, interest, or

[*34] security. He transferred the partnerships' income to his related entities without security, interest, or a repayment schedule. The trust documents grant sole discretion to the trustee to declare distributions to the beneficiary. In effect, the trustee did not have any authority to declare a distribution, however, because Watchman did not have a bank account from which to pay a distribution. Any distribution had to come from the partnerships' bank accounts, which Mr. Pudlo controlled. The named trustee played no role in the trusts. Mr. Pudlo controlled all decisions with respect to the trust property, i.e., the four partnerships. The trust documents and the parties' actions show that the Pudlos were not meaningfully restricted by the trust documents or by law, pointing to a sham trust.

The four factors weigh against the finding of a valid trust. Watchman was formed to avoid tax and lacked economic substance. Accordingly, we conclude that Watchman is a sham and is disregarded for Federal income tax purposes. The partnership income attributable to Watchman is taxable to the Pudlos. Because we have found that Watchman is a sham, we do not consider respondent's alternative arguments that Watchman is a grantor trust or the Pudlos improperly assigned the income to Watchman.

Respondent further argues that the four partnerships were created for tax avoidance purposes and should be disregarded for Federal income tax purposes.

[*35] Although respondent does not frame this issue as an alternative argument to the Watchman sham trust argument, it seems unnecessary to decide this question. Because we have found that Watchman is a sham, it seems to us that the partnerships' income is attributable to the Pudlos without the need to determine whether the four partnerships should also be disregarded for Federal tax purposes. Limited had three partners in addition to Watchman: Pro Cargo, an S corporation wholly owned by the Pudlos, owned 1%, and Mr. and Mrs. Pudlo owned a combined 5%. Only Mr. Pudlo held a partnership interest in Full-Circle, Gulf Cargo, and Auzano Pro in addition to Watchman. Under the check-the-box regulations, an entity with only one owner is disregarded for tax purposes unless it elects to be taxed as a corporation. Sec. 301.7701-3(b), Proced. & Admin. Regs. For the sake of completeness we briefly consider whether the four partnerships are shams for Federal tax purposes and should be disregarded. Respondent argues that the partnerships were organized for tax-avoidance purposes. We agree. "A partnership is generally said to be created when persons join together their money, goods, labor, or skill for the purpose of carrying on a trade, profession, or business and when there is community of interest in the profits and losses." Commissioner v. Tower, 327 U.S. 280, 286 (1946). The existence of some business purpose does not preclude a finding that a partnership is a sham; some tax considerations are

**[*36]** permissive.  Southgate Master Fund, LLC ex rel. Montgomery Capital

Advisors, LLC v. United States, 659 F.3d 466, 484 (5th Cir. 2011) (quoting Boca

Investerings P'ship v. United States, 314 F.3d 625, 631 (D.C. Cir. 2003)).  The

Court of Appeals for the Fifth Circuit considers all the relevant facts and

circumstances to determine whether a partnership is a sham.  Id. at 484-485

(considering the following factors:  the parties' agreement, their conduct in the

agreement's execution, their statements, the testimony of disinterested persons, the

relationship of the parties, their respective abilities and capital contributions, the

actual control of income, the purposes for which the income is used, and any other

facts that shed light on the parties' true intent) (citing Commissioner v.

Culbertson, 337 U.S. 733, 742 (1949)).

We hold that Mr. Pudlo did not intend to join together with Watchman and

Pro Cargo to conduct Limited's business and Mr. Pudlo did not intend to join

together with Watchman to conduct the businesses of Full-Circle, Gulf Cargo, and

Auzano Pro.  Mr. Pudlo continued to manage and operate the freight business after

Limited was organized, and he transferred Pro Cargo's business to Limited.  By

his own admission he understood that by restructuring the freight business he

could retain control over it.  He had total control over the operations, finances, and

bank accounts of each of the partnerships.  He have sole control over whether to

[*37] make distributions to Watchman and had exclusive control over distribution of the partnerships' income. Watchman was not involved in the management or business activities of the partnerships and did not have any authority with respect to the partnerships. Mr. Pudlo did not treat Watchman as a partner and did not share the profits and losses from the partnerships with Watchman as a partner. Watchman did not contribute any services or capital in exchange for its interests in the four partnerships despite being a 94% partner in Limited and a 99% partner in Full-Circle, Gulf Cargo, and Auzano Pro. After the formation of Limited, Mr. Pudlo's existing freight company, Pro Cargo ceased servicing clients, and Limited began to service the clients without any notice to the clients. The operation of the freight business did not change after the business restructuring. The Pudlos were not acting with a genuine business purpose when they formed the partnerships; rather, they acted for tax-avoidance purposes. Accordingly, we hold that the four partnerships are shams and are disregarded for Federal tax purposes.

III.   Statute of Limitations

The Commissioner must generally assess any income tax or issue a notice of deficiency within three years after a taxpayer files his return. Sec. 6501(a). The limitations period extends to six years where a taxpayer has a 25% gross omission. Sec. 6501(e)(1). A taxpayer may execute a written consent to extend the

**[\*38]** limitations period before its expiration. Sec. 6501(c)(4). For cases before the Court the period of limitations is suspended from the date that the notice of deficiency is mailed to 60 days after the Court's decision becomes final. Sec. 6503(a). In the Pudlo notice, respondent determined that the limitations period remained open for each year at issue on account of fraud, which respondent conceded on brief. He now asserts that the periods of limitations remain open for 2007 through 2010 on the basis of the 25% gross omissions and for 2007 on the basis of a written extension agreement.[14]

Petitioners challenge the validity of the Pudlos' written extension for 2007, arguing that Mr. Phipps did not have authority to agree to the extension. Respondent introduced Form 2848 authorizing Messrs. Paul and Phipps to act as the Pudlos' representatives. Respondent's introduction of the power of attorney form, valid of its face, satisfies respondent's burden and shifts the burden to petitioners to prove that the power of attorney was invalid. Pleasanton Gravel Co. v. Commissioner, 85 T.C. 839, 854 (1985); Lefebvre v. Commissioner, T.C. Memo. 1984-202, aff'd, 758 F.2d 1340 (9th Cir. 1985). Petitioners did not present any evidence of a defect in the form or the signatures. Likewise respondent

---

[14]In the alternative for 2010 respondent asserts that the period of limitations remains open on the basis of a written extension agreement. As there is a 25% gross omission for 2010, we do not address this alternative argument.

[*39] presented a written agreement, valid of its face, to extend the limitations period for 2007, satisfying respondent's burden and shifting the burden of proof to petitioners to show that the agreement is invalid. The statute of limitations does not bar the assessment of tax: (1) for 2007, on the basis that the Pudlos had a 25% gross omission, resulting in the application of the six-year period of limitations, and timely extended the six-year limitations period by written agreement, (2) for 2008, 2009, and 2010, on the basis that they had a 25% gross omission, and (3) for 2011 and 2012, on the basis that the normal three-year period of limitations remains open.

Section 6229 provides special rules regarding the statute of limitations for assessing tax with respect to partnership or affected items. Sec. 6501(n)(2). It does not provide a separate period of limitations for assessments relating to partnership items; it sets a minimum limitations period that may extend the general period under section 6501. Rhone-Poulenc Surfactants & Specialties, L.P. v. Commissioner, 114 T.C. 533, 542 (2000). A timely issued FPAA suspends the section 6501 period of limitations of a partner with respect to partnership items. Sec. 6229(d). The identity of a partner is often a partnership item. Blonien v. Commissioner, 118 T.C. 541, 551-552 (2002). The maximum period for assessment of tax is governed by the period for assessment against the partner.

[*40] Blak Invs. v. Commissioner, 133 T.C. 431, 436-438 (2009); Kligfeld

Holdings v. Commissioner, 128 T.C. 192, 200-201 (2007).  Petitioners contend

that the period of limitations expired for each year at issue before respondent

issued the FPAAs to the four partnerships.  We disagree.  The periods of

limitations for the Pudlos' partnership items cannot expire before their applicable

statute of limitation dates under section 6501.  The period of limitations with

respect to partnership items for the four partnerships would expire on the basis of

the later of the date determined pursuant to section 6229 or the date determined

under section 6501.  Curr-Spec Partners, L.P. v. Commissioner, 579 F.3d 391, 393

(5th Cir. 2009), aff'g T.C. Memo. 2007-289; Blak Invs. v. Commissioner, 133

T.C. at 436-438.  The Pudlos' written extension agreement for 2007 expressly

stated that it applied for the assessment of tax attributable to partnership items.

See sec. 6229(b)(1)(A), (3) (requiring that a partner's written extension expressly

state that it applies to partnership items).  The FPAAs were timely for each of the

partnership items as determined by the Pudlos' period of limitations under section

6501.  The limitations period for each year at issue was open on June 2, 2015, the

issue date of the Pudlo notice.  Respondent issued the FPAAs to the four

**[\*41]** partnerships before he issued the Pudlo notice. Accordingly, he timely issued the FPAAs with respect to the partnership or affected items.[15]

IV.    Penalties

Section 6662(a), (b)(1) and (2), and (d)(1)(A) imposes a 20% accuracy-related penalty on any underpayment of tax attributable to a taxpayer's negligence or disregard of rules or regulations, or a substantial understatement of income tax, defined as an amount equal to the lesser of 10% of the tax required to be shown on the return or $5,000. Petitioners argue, citing section 6751(a), that respondent cannot raise the section 6662 accuracy-related penalties because he did not determine the penalties in the Pudlo notice. They further argue that respondent lacks authority to impose the section 6662(a) penalties because he conceded the only penalties that he determined in the Pudlo notice.[16] Respondent affirmatively

---

[15]The fact that respondent did not determine adjustments to the income of the four partnerships is not relevant to whether the period of limitations is open with respect to partnership items attributable to the Pudlos. See sec. 6229(c). The period of limitations as to the Pudlos is governed by sec. 6501.

[16]Petitioners argue that respondent must prepare substitutes for returns for the Pudlos under sec. 6020(b) because he determined the fraud penalty. Sec. 6020(b) grants authority to the Secretary to execute a return for a taxpayer who fails to file a return or has filed a false or fraudulent return. This section is permissive, not mandatory. United States v. Stafford, 983 F.2d 25, 27 (5th Cir. 1993); Roat v. Commissioner, 847 F.2d 1379, 1381 (9th Cir. 1988). Nothing in the Code or caselaw requires the Commissioner to prepare a substitute for return

(continued...)

**[\*42]** asserted the section 6662(a) accuracy-related penalties in his answer. He contends that he complied with the section 6751(b)(1) requirements for written supervisory approval for the section 6662 accuracy-related penalties against the Pudlos. See Graev v. Commissioner, 149 T.C. ___, ___ (slip op. at 5, 14) (Dec. 20, 2017), supplementing 147 T.C. 460 (2016). He alleges that his trial counsel made the initial determination for the Pudlos' liability for section 6662(a) penalties and first asserted the penalties in the answer in the Pudlos' case. The trial counsel's supervisor approved the determination in writing through her signature on the answer, satisfying his burden of production with respect to the section 6751(b)(1) supervisory approval requirement. The section 6662(a) penalties are properly before the Court.

The Pudlos omitted more than 25% of their income from their joint tax return for each year at issue; they had a substantial understatement of income tax that supports the imposition of the section 6662(a) and (b)(2) penalty. Sec. 6664(c)(1). Generally the taxpayer has the burden of proving a defense to the

---

[16](...continued)
when he asserts the sec. 6663 fraud penalty. See Brenner v. Commissioner, T.C. Memo. 2004-202, slip op. at 11 ("[I]t is firmly established that section 6211(a) does not require the Commissioner to prepare a substitute for return before determining a deficiency and issuing a notice."), aff'd, 164 F. App'x 848 (11th Cir. 2006).

[*43] section 6662(a) penalty, including whether the taxpayer had reasonable cause for the underpayment and acted in good faith. See Higbee v. Commissioner, 116 T.C. 438, 446 (2001). However, the Commissioner bears the burden of proof for any new matter pleaded in the answer. Rule 142(a)(1). When a penalty is a new matter, the Commissioner bears the burden of proving the absence of reasonable cause. RERI Holdings I, LLC v. Commissioner, 149 T.C. ___, ___ (slip op. at 63-65) (July 3, 2017); Rader v. Commissioner, 143 T.C. 376, 389 (2014), aff'd in part, appeal dismissed in part, 616 F. App'x 391 (10th Cir. 2015); Arnold v. Commissioner, T.C. Memo. 2003-259. Respondent determined section 6663 fraud penalties against the Pudlos in the Pudlo notice and asserted section 6662(a) accuracy-related penalties for the first time in his answer. Imposition of the section 6662(a) accuracy-related penalties is a new matter that would require petitioners to present evidence that they were not initially required to present. Accordingly, respondent has the burden to prove the absence of reasonable cause for the Pudlos' underpayments for the section 6662(a) penalties to apply.

We determine whether a taxpayer acted with reasonable cause and in good faith on a case-by-case basis, taking into account all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. A taxpayer's reliance on the advice of a tax professional may constitute reasonable cause and good faith.

[*44] United States v. Boyle, 469 U.S. 241, 250 (1985).  We have summarized the requirements of reasonable reliance on professional advice as follows:  (1) the taxpayer reasonably believed that the professional is a competent tax adviser with sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment.  Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98-99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).  The taxpayers' education and business experience are relevant when considering their reliance on an adviser and their good faith.  Sec. 1.6664-4(c)(1), Income Tax Regs.  The most important factor is the extent of the taxpayers' effort to assess their proper tax liability.  Id. para. (b).  The reasonable cause defense does not require that taxpayers challenge their attorney's advice or independently investigate its propriety.  Streber v. Commissioner, 138 F.3d 216, 219 (5th Cir. 1998), rev'g T.C. Memo. 1995-601.  Nor are taxpayers required to monitor the extent or sufficiency of their adviser's research on complicated tax issues.  Stanford v. Commissioner, 152 F.3d 450 (5th Cir. 1998), aff'g in part, vacating in part 108 T.C. 344 (1997).

Respondent has not established that the Pudlos lacked reasonable cause for their tax reporting.  The Pudlos did not have any education or experience in tax or business planning.  Mr. Pudlo has a college degree and a successful business but

**[*45]** does not have any specialized knowledge or experience with tax. He attempted to stay informed about tax matters by reading tax articles, but he was not sophisticated in tax matters. Initially he relied on Mr. Ohendalski to assist in the formation of the new ownership structure for the freight business and copied that structure for the three subsequent partnerships. He subsequently relied on other advisers at the Legacy Group who were C.P.A.s and on attorneys recommended by the Legacy Group. Subsequently, Mr. Ohendalski lost his C.P.A. license because he did not timely file his own income tax returns, but the Pudlos relied on other tax professionals to prepare the returns at issue. The Pudlos believed the return preparers were competent and qualified to provide tax services, and respondent has not shown otherwise.

The Legacy Group prepared Watchman's, Limited's, and Lighthouse's returns. But the Pudlos had a separate firm, Paul, Phipps, prepare their joint tax returns. They provided relevant information to their return preparers; the return preparers did not request any additional documentation. Respondent has not shown that the return preparers and advisers for the Legacy Group or Paul, Phipps were incompetent or unqualified. Mr. Phipps signed the Pudlos' joint income tax returns as the return preparer for 2007 through 2009. He was a C.P.A. and had over 20 years of experience in public accounting. Beginning in 2010 Mr. Paul

[*46] signed the Pudlos' returns. Respondent has not established that it was not reasonable for the Pudlos to rely on either of them.

We cannot say that the Pudlos failed to do what reasonable and prudent persons would do under similar circumstances. After his prior experience with a prolonged IRS audit that resulted in no adjustments, Mr. Pudlo wanted to make his business "audit-proof", which to him meant that "nothing was hidden" and there was no concealed income or excessive expense deductions. He wanted tax reporting where "everything is above board and laid on the table." We believe that Mr. Pudlo was sincere in his testimony except to the extent he denied knowledge with respect to Watchman. While Mr. Pudlo knew that he was not paying income tax on his business income, he believed that he was being honest in his income tax reporting as the untaxed money was being given to charity and reinvested in his business.

Mr. Ohendalski did not prepare returns or advise the Pudlos during the years at issue. The Pudlos worked with different return preparers. The tax professionals at the Legacy Group and Paul, Phipps who prepared the returns for the years at issue did not raise any questions or concerns with the tax reporting. From Mr. Pudlo's unsophisticated viewpoint he was reporting all the partnership income. The partnerships maintained adequate records, and respondent did not make any

[*47] adjustments to the reported partnership income.  The untaxed income remained within the business or was given to charity; Mr. Pudlo transferred the partnerships' income to his related entities to expand his business or to charity.  In the light of these facts, we cannot say that it is not reasonable for unsophisticated taxpayers such as the Pudlos to rely on the tax advice they received for the years at issue.  We hold that respondent has not met his burden to prove that the Pudlos lacked reasonable cause.  Accordingly, the Pudlos are not liable for the section 6662(a) accuracy-related penalties.

In reaching our holding, we have considered all arguments made, and, to the extent not mentioned above, we conclude that they are moot, irrelevant, or without merit.

<u>Appropriate orders will be issued</u>.